J. Lance LAZONBY and Shirley B. Lazonby his wife, Plaintiffs,

v.

Laurie W. TOMLINSON, former District Director of Internal Revenue Service for the District of Florida, Defendant.

Civ. A. No. 387.

United States District Court
N. D. Florida,
Gainesville Division.

May 4, 1967.

---

Chester Bedell, Robert P. Smith, Jr., of Bedell, Bedell, Dittmar & Smith, Jacksonville, Fla., for plaintiffs.

Eugene P. Kopp, Atty. Tax Div., Dept. of Justice, Washington, D. C., Clinton Ashmore, U. S. Atty., Tallahassee, Fla., for defendant.

CARSWELL, Chief Judge. ·

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The basic issue here is whether taxpayers Lazonby and wife, are entitled to take deductions for losses from activities characterized as "farming operations" in Alachua County, Florida, within this district. There are three taxable years involved here: 1959, 1960 and 1961. There is no question about the jurisdiction of this Court. The record shows that a jury has been waived, the taxes have been paid into the Treasury of the United States, and demand for trial in this court has been met.

There is no fundamental argument as to the applicable law in this case. Through a whole line of decisions from the other District Courts of Florida, from the Fifth Circuit, and the Supreme Court, it is perfectly clear there is no one magic wand, no one facet, which the Court can grasp, or the jury can grasp, and say, here is the answer. There are a number of factors which must be considered. They have been summarized clearly and ably by counsel for both sides. Some of the cases, quite obviously, have been determined on one of the factors to a greater extent than the other. This is not to say that the law here is dark haze lacking a guiding beacon. On the contrary, the lesson to be learned from all of these

cases is that each must be determined on its own factual basis. Facts are, indeed, stubborn things and they have a way of carrying the day under the circumstances. Particularly so it is here. The facts control.

From the evidence as a whole the Court finds and concludes that during these years the taxpayer had reasonable basis to expect that the activities entitled him and his wife to the claimed deductions as a legitimate business enterprise and that they were conducting a farming operation within the meaning of the statute.

The facts show that in the year 1949 taxpayer Lazonby, then engaged in the practice of law in Gainesville, bought a piece of property near the city where he hoped to build later a residence and, also, to start immediately into some kind of commercial venture involving the raising, care, and development of animals, it being his original thought that this would involve horses. The Court finds from the evidence that he then had extensive experience with horses, having been equitation teacher at the University of Florida and having served in the Artillery of the United States in World War II until the Army discontinued use of horses about 1943.

While his intention in this regard embraced a keen personal interest and predilection, the operation actually developed cannot be characterized in this instance as being solely or primarily a hobby. Lazonby had an early discussion with a Mr. Rose, in Ocala, who was then engaged quite extensively in the breeding of thoroughbreds. It was Lazonby's original thought to start a commercial venture by taking some rejected thoroughbreds, those not fit for the tracks, and by process of breeding with Arabians, to develop animals which would be commercially profitable. The subject tract of land was selected, among other reasons, the evidence shows, because it lent itself to this particular venture. The land had several bluffs on either side of a creek that traversed it, ranging from thirty to ninety feet in height. The bluff was pe-

culiarly advantageous for this purpose for by riding the horses up the steep incline the horses would develop desirable contour and strength of rear.

After further consideration, however, Lazonby decided that the horse enterprise, although it was obviously dearer to his heart as a personal enjoyment factor, would not be a sensible economic venture. Instead he then investigated the possibilities of placing cattle upon the property. This he discussed with his neighbors, among others, Mr. Mason, who had an adjoining eighty acre tract supporting white face Herefords at the time. Lazonby's tract was also eighty acres. He discussed it with other people in the area who were in the cattle business, and decided upon a Black Angus herd, or as fine a strain of Black Angus as he could afford. It is important to note here that the facts show at this particular time in the late forties and early fifties, the taxpayer's income as an attorney was around ten to twelve thousand dollars per year. While this provided a comfortable living for himself and five dependents it is also clear that he did not possess such excess funds to invest extensively in any nonprofessional pursuits devoid of reasonable hope of remunerative gain.

Ultimately, he invested money in the purchase of a herd of brood stock from Texas at about $200 a head, some $3,642 for 15 head. These were certified to be 15/16th Black Angus. They were not registered. They were then characterized as being "Grade," not being absolutely purebred but obviously of high quality blood line. Throughout this entire period the record shows from its very inception he had only a few cows before a venture with Mr. Atkins, but throughout all of this period of time the profit has been none, the losses have been some, in each and every year. The Court concludes and finds it a fact that it was the intention of the taxpayer with respect to this matter to enter into this last cattle venture on a purely commercial basis. The Court is not impressed by the contention of the government that the existence of an attractive home there ne-

gates this conclusion. There is no connection shown whatsoever in any of the testimony that the home and the farm were fused into one thing. The fact that the pastoral grounds surrounding the house might by some notion be rendered attractive to view from the window is not considered important in determining whether the taxpayer was in good faith attempting to make money from the land. This lends no comfort to the government's position whatsoever.

The evidence does show and the Court finds that during all of this period of time that the house existed, the immediate yard area around the house was cared for and was treated entirely separately from the operation of the farm. Most of the clearing of the land, the building of fences, was done by the taxpayer himself, with assistance from time to time of common labor. He also had the assistance at one period of time of a student and his wife when the taxpayer was engaged in the performance of duties as president of The Florida Bar. But the overwhelming evidence, and this is undisputed, is that this operation was carried on almost exclusively by the taxpayer personally. This included the clearing and the development of the land, planting some twenty-eight acres in Bahai grass, and later some thirty-four acres on the back or north side of the property. There was a good deal of clearing to be done, which was done by the taxpayer. Virtually all of the feeding of the cows throughout the entire period has been done by the taxpayer, personally, and frequently at night. There is no question but that the overwhelming part of his time has been consumed in the practice of law. The evidence shows here that for a certain period of time this property was rented, that is, for grazing purposes for ponies, animals not owned by Lazonby, but owned by others.

There are few, but some, areas where there is direct conflict in the testimony between Lazonby and Litheiser, Internal Revenue Agent, all having to do with what statements were made, or allegedly made, by Lazonby in their two conferences or one or the other of the two conferences.

The evidence shows that there were indeed two conferences between Litheiser and Lazonby. The Court concludes that there are a number of conflicting statements in Litheiser's testimony. There is some dispute whether a Mr. Purvis was present at the meeting. Purvis testified categorically that he was present at the meeting, as did Lazonby. Litheiser had no recollection of this. The Court does not find that Litheiser misstated the truth, but his recollection of events doesn't jibe with the other and more credible evidence in the case in some important details. The Court has to look to the other evidence to find wherein the truth lies. However, these conflicts are not, the Court finds, actually determinative. It is the emphasis upon the words placed by Litheiser and the words admittedly used by Lazonby where the real conflict between the two comes. For example, Litheiser testified that Lazonby showed him a pony ring on the place and indicated that it was used by Lazonby's children. It is testified otherwise, and the Court believes to be true and finds from this record, that there was in fact no pony ring ever on the subject place.

There was much testimony, perhaps too much, about who said what to whom at these various conferences. This has no relevancy in this case at all except insofar as it might throw light upon the intention of the taxpayer, in good faith, to carry on his business for profit during the critical years. It has been received in evidence for that limited purpose.

After a period of time the taxpayer went into a partnership arrangement with a Mr. Atkins who invested with Lazonby in the purchase of more stock for development on the Lazonby place.

The herd was enlarged until it reached the desired optimum of some 30 to 40 animals in 1958–1959. During this year the herd was drastically reduced by sale of most of the animals. The record is clear that this liquidation or reduction

operation was brought about due to the financial need of partner Atkins to recoup his original investment or as much thereof as he could.

■ The government concedes that up until 1958 there might be some reasonable basis for hope of profit, but it urges that after the Atkins partnership was dissolved it was unreasonable to expect a profit out of this operation. Even in 1958 when the herd was sold it was also an unprofitable matter. The Court finds controlling here, however, that the herd was sold primarily for the purpose of recouping partner Atkins' investment. Atkins' financial condition had worsened in the interim since his original investment, and the animals were liquidated merely as beef cows, when actually they would normally have brought a considerably higher price had they been marketed without duress as quality animals. The dissolution of the Atkins partnership in 1958, therefore, did not preclude a continuation of the activities by Lazonby alone nor foreclose reasonable expectation of ultimate financial success. The death knell of this venture as a reasonable business venture was not Atkins' withdrawal in 1958; it was some 3 years later, in June 1961, that the Florida Legislature rang down the curtain and with finality.

■■ The Court finds that it should have been perfectly obvious in July 1961 that it was then no longer reasonable to expect profit; but prior to that time the taxpayer had good cause to aspire to profit. The basic reason for this, the Court finds, as previously noted, is that in June 1961 the Florida Legislature incorporated this taxpayer's entire property within the city limits of Gainesville. A short time prior to 1961 an effort was made to incorporate this area into the city by a referendum and it was defeated by the people. Lazonby, the Court concludes, knew or must have known, or reasonably must be held to have known, that at this point the jig was up, so to speak, insofar as his being able to operate a successful eighty acre cattle ranch in the City of Gainesville. To continue the effort would be unreasonable, untenable, and probably in violation of city ordinances with respect to keeping animals in the city. Therefore, the Court finds that there was no reasonable basis at this point to expect the farming operation to engender itself into a profitable business. It was a matter of business judgment before this time. From the evidence in this case prior to July 1961 it was reasonable to conclude that this venture could be made profitable by careful handling and proper management. After July 1961, however, this Court finds that no reasonable, prudent businessman would assume that cattle could be raised profitably on this particular acreage.

■ Therefore, it follows, that prudent liquidation was required to start promptly after the passage of the Act. The Act became effective January 1, 1962. Thus, there was some six months' advance notice of this farm's incorporation into the city limits. Liquidation inevitably had to take place. The Court concludes that it would be reasonable within that period of time to liquidate the operation, i. e., from July 1, 1961 to January 1, 1962. In July 1961 the herd consisted of fifteen brood cows, and some few other animals.

Upon this evidence as a whole and applying each of the facts previously enumerated, the Court concludes that it was the reasonably predicated intention of the taxpayer to operate a business for profit in the taxable years here involved. It also finds that there was a reasonable basis for hope of financial gain for the business venture during these years. As of July 1, 1961, however, there was no reasonable ground to expect, or to hope, to make a profit from raising cattle on this particular property after January 1, 1962. The plaintiff has carried the burden of proof with respect to these particular years: 1959, 1960 and 1961.

Final judgment will be entered accordingly.

## FINAL JUDGMENT

In accordance with Findings of Fact and Conclusions of Law entered this date and the Court having concluded that the plaintiffs are entitled to judgment on the law and the evidence, it is, upon consideration, hereby

Ordered, adjudged and decreed that the plaintiffs, J. Lance Lazonby and Shirley B. Lazonby, husband and wife, have and do recover from the United States of America the sum of $2,801.95, with interest as authorized by law and costs to be taxed by the Clerk in accordance with law.